IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| T-MOBILE NORTHEAST LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    NO. 1:11-CV-1201 (GBL/JFA) |
| | ) |
| LOUDOUN COUNTY | ) |
| BOARD OF SUPERVISORS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

THIS MATTER is before the Court on the parties' cross-motions for summary judgment.
T-Mobile Northeast LLC ("T-Mobile") brought this civil action against the Loudoun County
Board of Supervisors ("the Board") for alleged violations of federal telecommunications law
based on the Board's denial of applications to construct two personal wireless service facilities in
Loudoun County, Virginia.

There are six issues before the Court. The first issue is whether T-Mobile has standing to
assert claims based on the denial of its application to construct a wireless facility on the property
of the Christ Our Savior Lutheran Church in Sterling, Virginia ("the Bell Tower application").
The Court holds that T-Mobile has standing to assert these claims because it has shown that it
has a property interest in its option lease with the Church that was injured when the Board denied
its application.

The second issue is whether T-Mobile has demonstrated that, in denying the Bell Tower
application, the Board effectively prohibited the provision of personal wireless services in
violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). The Court holds that the Board is entitled to

1

summary judgment on T-Mobile's effective prohibition of service claim because T-Mobile cannot show that denial of the Bell Tower application was tantamount to a general prohibition on the provision of wireless services. T-Mobile has failed to offer any evidence that it has a legally cognizable deficit in coverage or that it lacks reasonable alternative sites to provide coverage in the area surrounding the Church. For these reasons, the Court grants the Board's Motion for Summary Judgment as to Count II of T-Mobile's Third Amended Complaint.

The third issue is whether the Board's decisions to deny T-Mobile's applications to construct wireless service facilities were supported by substantial evidence in the record before the Board as required by 47 U.S.C. § 332(c)(7)(B)(iii). The Court holds that the Board's decisions were supported by substantial evidence of the negative visual impact of the proposed facilities and their incompatibility with their surrounding areas. Additionally, in the case of T-Mobile's application to build a wireless service facility on the Stephens Farm in Lovettsville, Virginia ("the Stephens Silo application"), there was evidence that T-Mobile failed to pursue locations for its facility that were preferred under local zoning policies. For these reasons, the Court grants the Board's Motion for Summary Judgment as to Counts I and IV of T-Mobile's Third Amended Complaint.

The fourth issue is whether the Board's decisions denying T-Mobile's applications were based on concerns about the environmental effects of radio frequency ("RF") emissions from the proposed facilities in violation of 47 U.S.C. § 332(c)(7)(B)(iv). The Court holds that the Board is entitled to judgment as a matter of law on T-Mobile's § 332(c)(7)(B)(iv) claim based on the denial of the Bell Tower application. T-Mobile offers no evidence showing that the Board's decision to deny the Bell Tower application was based on effects of RF emissions. Accordingly, the Court grants the Board's Motion for Summary Judgment as to Count III of T-Mobile's Third

Amended Complaint. However, T-Mobile is entitled to judgment as a matter of law on its §
332(c)(7)(B)(iv) claim based on the denial of the Stephens Silo application because the Board
expressly identified environmental effects of RF emissions as a basis for its decision. The Court
holds that the Board's decision is therefore void under the Telecommunications Act and orders
the Board to grant the Stephens Silo application.

## I.    BACKGROUND

T-Mobile Northeast LLC ("T-Mobile"), a wholly owned subsidiary of T-Mobile USA,
Inc., provides personal wireless communications services throughout the Middle Atlantic states.
T-Mobile's personal wireless services include voice, data, and broadband internet services. The
company is registered to conduct business in the Commonwealth of Virginia and uses licenses
issued by the Federal Communications Commission ("FCC") to provide wireless service in
Loudoun County, Virginia. In order to provide reliable wireless service in a specific geographic
area, T-Mobile must place a wireless service site within that area. T-Mobile has placed 56
wireless sites in Loudoun County since obtaining approval of zoning applications for 63 sites.
Dep. of Jason Campbell at 8–9 [hereinafter Campbell Dep.].

This case concerns T-Mobile's efforts to construct monopole telecommunications towers
on the property of the Christ Our Savior Lutheran Church ("the Church") in Sterling, Virginia,
and the Stephens Farm in Lovettsville, Virginia, in order to improve the reliability of its wireless
service in the surrounding areas. The Church is in a zoning district designated CR-1 for
"Countryside Residential," and in an area of the County designated the Eastern Loudoun County
Growth Area. The Stephens Farm is in a zoning district designated AR-1 for "Agricultural
Rural." Under the Loudoun County Zoning Ordinance, a telecommunications monopole cannot

3

be constructed in certain zoning districts, including CR-1 and AR-1 districts, without a special exception from the Loudoun County Board of Supervisors ("the Board"). Loudoun County, Va., Zoning Ordinance §§ 2-504(MM), 5-618(B)(2)(a) (Jan. 7, 2003) [hereinafter Z.O.]. Factors considered in assessing a request for a special exception include whether the proposal is consistent with the Loudoun County Comprehensive Plan, whether it is compatible with other existing uses in the vicinity, whether it will promote public welfare or convenience, and other factors. Z.O. § 6-1310. The Zoning Ordinance requires the Loudoun County Planning Commission to conduct a public hearing and to provide a recommendation to the Board prior to the Board's decision on an application for a special exception. Z.O. § 6-1309(B)(1).

Additionally, the construction of a telecommunications monopole requires a commission permit from the Planning Commission. Z.O. § 5-618(B)(3)(j). The Planning Commission must approve the location and character of the proposed structure as substantially in accord with the Comprehensive Plan. VA. CODE ANN. § 15.2-2232(B) (2012). After considering an application for a commission permit, the Planning Commission is required to communicate its findings to the Board, indicating its approval or denial of the application with reasons provided in writing. *Id.* The Board may overrule the Planning Commission's decision by a vote of the majority of its membership. *Id.*

In this case, T-Mobile challenges the Board's decisions to deny commission permits and special exceptions for the construction of monopoles at the Church and at the Stephens Farm. The Court will summarize relevant provisions of the Loudoun County Zoning Ordinance and Comprehensive Plan, and then briefly review the history of T-Mobile's zoning applications with respect to the two proposed wireless sites at issue in this case.

4

## A. The Loudoun County Zoning Ordinance and Comprehensive Plan

The Loudoun County Zoning Ordinance sets forth certain performance standards applicable to new commercial public telecommunications monopoles. A proposed telecommunications monopole is required to be "compatible with development in the vicinity with regards to the setting, color, lighting, topography, materials and architecture." Z.O. § 5-618(B)(3)(a). Additionally, the facility must be "located in the interior of the property and areas of existing vegetation, if applicable, [must] be used to screen the facility." *Id.* "Unless otherwise required by the Federal Communications Commission or the Federal Aviation Administration, monopoles shall blend with the background." Z.O. § 5-618(B)(3)(g). Applicants for new monopoles in certain zoning districts, including CR-1 and AR-1 districts, are required to assess the feasibility of locating their proposed facilities on existing structures within the vicinity of the proposed site. Z.O. § 5-618(B)(4)(b). Applicants must evaluate facilities and structures greater than 40 feet in height within a one-mile radius of any proposed monopole within the Eastern Loudoun County Growth Area and within a two-mile radius of any proposed monopole elsewhere in the County. *Id.*

The Strategic Land Use Plan for Telecommunications Facilities ("Telecom Plan") is part of Loudoun County's Comprehensive Plan. Objectives of the Telecom Plan include "ensur[ing] compatibility of telecommunications facilities with nearby land uses" and "establish[ing] siting and design criteria to mitigate negative impacts[.]" BOS-022336.[1] The Telecom Plan also "identif[ies] a hierarchy of areas where future commercial public telecommunication facilities can be located, while minimizing the proliferation of towers and monopoles[.]" *Id.* First in the County's hierarchy of preferred locations is "to have new antennas collocate on existing tall structures, monopoles and towers in order to minimize the need for new towers and monopoles."

---

[1] Parts of the evidentiary record will be identified by Bates number.

BOS-022338. When such collocation is not feasible "for technical or location reasons, the County then prefers that new towers or monopoles be located where they are most compatible with surrounding land uses." *Id.* "Except for areas where towers or monopoles are permitted by right," the applicant for a new tower or monopole must demonstrate that "location on an existing tall structure is not feasible." BOS-022339. The Telecom Plan also provides that "[t]he visual impact of commercial public telecommunications facilities should be mitigated so as to blend with the natural and built environment of the surrounding area." BOS-022341.

### B. The Bell Tower Application

T-Mobile entered an agreement with the Church in March 2008 that granted the company an option to lease a tower to be constructed on a portion of the Church's property for the installation and use of telecommunications facilities ("the Premises"). TM-002424. The agreement required the Church to cooperate with T-Mobile's efforts to obtain "all licenses and permits or authorization required for [T-Mobile's] use of the Premises . . . from all applicable government and/or regulatory entities . . . , including all land use and zoning permit applications[.]" *Id.* T-Mobile's option has since been extended to March 13, 2013. TM-002863.

After obtaining its option lease with the Church, T-Mobile filed with the Loudoun County Planning Department an application for a commission permit and special exception for an 80-foot "stealth" light pole telecommunications facility to be located on the southwest corner of the Church's property. BOS-002108. Planning Department staff declined to recommend approval of the application. Staff determined that T-Mobile's proposed location "within a predominantly residential community" was "not one of the County's preferred locations for new commercial public telecommunication facilities." BOS-000236. The proposed location also "raised significant concerns that the proposed telecom facility [would] be incompatible with the

surrounding land uses." BOS-000232. In addition, Planning Department staff noted the "significant" and "negative" visual impact the proposed facility would have on the surrounding residential area, notwithstanding T-Mobile's efforts to mitigate the visual impact with a stealth light pole design, a landscape buffer, and wood fencing. BOS-000236, -000239. Finally, staff recommended that T-Mobile make further efforts "to mitigate the visual impact on the surrounding area to the greatest extent possible" and hold "a community meeting . . . to further refine [staff's] recommendations." BOS-000239.

After negative responses from community members and further discussions about the design of the proposed facility with the Church and Planning Department staff, T-Mobile amended its proposal in July 2010. The amended application proposed an 80-foot "stealth" bell tower telecommunications facility on a grass island in the Church's parking lot ("the Bell Tower site"). BOS-002014. Planning Department staff noted that the new design "blend[ed] more effectively into the context of the existing church property" than the previous proposal. BOS-000242. However, staff continued to express concerns that T-Mobile's proposed facility would be incompatible with surrounding land uses and have a negative visual impact on the area "due to the 80-foot proposed height of the facility and proximity of existing residences." BOS-000242–43. On these grounds, Planning Department staff declined to support T-Mobile's amended application ("the Bell Tower application") and recommended "additional design considerations" to mitigate the visual impact of the Bell Tower site. BOS-000243. T-Mobile subsequently revised its design proposal to incorporate the main colors of the church building. BOS-001867. Based on this revision, Planning Department staff determined that the Bell Tower site was "compatible with the design of the church and therefore appear[ed] to be a structure that might normally be associated with a church." BOS-001868. Notably, staff found "that the

7

proposed bell tower [would] still create visual impacts on the surrounding land uses due to the 80-foot proposed height of the facility and proximity of existing residences." BOS-001867. However, staff found sufficient mitigation of the proposed facility's visual impact to justify approval of the Bell Tower application, BOS-001868, and recommended approval to the Planning Commission. BOS-001869, -004037A.

The Planning Commission held a public hearing on the Bell Tower application on February 23, 2011. Several residents of the area surrounding the proposed Bell Tower site voiced their opposition to the site for reasons including the fact that the height of the facility was out of proportion with its surroundings, that the facility would have a negative visual impact, and that it would diminish the residential character of the area. BOS-004047A–52A . Hundreds of area residents signed a petition against approval of the Bell Tower application. BOS-002373–2431. In June 2011, the Planning Commission voted 5 to 4 to grant a commission permit for the Bell Tower site and to recommend to the Board approval of a special exception for the site. BOS-022194.

The Board held a public hearing on the Bell Tower applications on September 12, 2011. Several members of the public testified at the hearing, and all but one of them opposed the Bell Tower site. BOS-003961A–4023A. The residents cited a number of reasons for opposing the Bell Tower application, including the size and visual impact of the proposed facility and concerns about the health effects of radio frequency ("RF") emissions from the facility. BOS-003986A–4014A. A child testified that he lived "across the street" from the Bell Tower site and opposed the cell site because "there is a chance that [he and] other children . . . could get cancer and get very sick and maybe even die." BOS-004004A. Another resident of Sterling produced a report downloaded from the internet that, according to him, determined that wireless service sites

8

are radiation hazards and have negative health effects. BOS-004010A. Other residents opposing the Bell Tower site commented that the size of the facility was out of proportion with its surroundings and that it would have negative visual impacts on their communities that T-Mobile failed to mitigate. *See, e.g.*, BOS-003993A–94A, -003996A–97A, -004007A.

On October 4, 2011, the Board unanimously voted to overturn the Planning Commission's decision and to deny the commission permit and special exception for the Bell Tower site. BOS-003760. The Board found that "[t]he location of the proposed facility [did] not meet the location policies in the [Telecom Plan]" and was instead located "in a suburban, residential community." *Id.* T-Mobile's proposal "[did] not adequately mitigate the impacts on adjacent residential uses" and was incompatible "with existing residences in the immediate vicinity." *Id.*

### C. The Stephens Silo Application

Seeking to improve its coverage in the area surrounding the Stephens Farm in Lovettsville, Virginia, T-Mobile searched for suitable sites for collocation on existing tall structures. Declaration of Jason Campbell at ¶ 7 [hereinafter Campbell Decl.]. In 2008, T-Mobile identified existing silos on Simpson Farm Lane and considered extending the height of the taller silo to meet its coverage needs. Campbell Decl. at ¶ 7; BOS-001431, -002824–25. However, in 2009, the company discovered that the property was in foreclosure and therefore considered the location unavailable. Campbell Decl. at ¶ 7; BOS-001432, -002732. The property was sold in January 2011. BOS-003836.

T-Mobile decided to pursue a raw land alternative and reached an agreement to construct a new telecommunications monopole on the property of the Stephens Farm ("the Stephens Silo site"). Campbell Decl. at ¶ 7. In August 2010, T-Mobile applied for a commission permit and

9

special exception to build a 125-foot tall, 36-foot wide telecommunications monopole designed to resemble a silo ("the Stephens Silo application"). BOS-003175, -001426. Upon review of the Stephens Silo application, Loudoun County Planning Department staff indicated concerns about the height of the proposed facility, noting that "the majority of the agricultural silos in the County . . . are between 40 to 60 feet" in height. BOS-002923. Despite this concern, the Planning Department staff ultimately recommended approval of the application, finding that the interior location and "stealth" design of the proposed facility were "in conformance with [Comprehensive] Plan policies and provide[d] an innovative solution to providing telecommunication services to the area that is sensitive to the surrounding rural agricultural landscape." BOS-002933. Planning Department staff found that, "although the stealth silo [would] be visible from adjacent and surrounding properties, the 'stealth' design [was] a viable alternative to traditional monopole construction that [would] help blend the facility with the agricultural character of the [surrounding area]." BOS-002925.

On May 25, 2011, the Planning Commission held a public hearing on the Stephens Silo application. Residents of the area testified that they were opposed to the proposed facility due to its size, visual impact, architectural incompatibility with its surroundings, and concerns about the health effects of radiation from the facility. BOS-022178–82. T-Mobile subsequently revised its proposal to reduce the height of the facility to 100 feet and the width to 24 feet. BOS-002863. On June 22, 2011, the Planning Commission voted to grant a commission permit for the Stephens Silo site and to recommend approval of a special exception to the Board. BOS-022209.

The Board held a public hearing on the Stephens Silo application on July 11, 2011. BOS-022210–64. Several members of the public testified at the hearing, and all residents of the area near the proposed site who spoke at the hearing were opposed to the facility. BOS-022236–50.

10

The residents cited a number of reasons for opposing the Stephens Silo application, including T-Mobile's failure to mitigate the visual impact of the facility and the fact that the size of facility was out of proportion with surrounding buildings and vegetation. *Id.* One resident of Lovettsville expressed concerns about the health effects of exposure to radiation from cell sites, citing studies linking such exposure to cancer and other medical issues. BOS-022238–39. A professional engineer made a presentation to the Board on RF health and safety, and was questioned at some length by one member of the Board, Supervisor Miller. BOS-022253–58. Supervisor Miller then asked counsel for the County, who was present at the hearing, whether "local government [was] prohibited from factoring health issues into its decision-making process for cell phone applications." BOS-022259. The County Attorney stated that he did not recall the answer to the question, and Supervisor Miller responded, "I think before we go to a final vote on this, we need to get any advice that might be relevant to that." *Id.* After the hearing, T-Mobile revised its proposal again, reducing the height of the proposed facility to 90 feet. BOS-002669.

The Transportation and Land Use Committee of the Board of Supervisors met on September 21, 2011, to discuss the Stephens Silo application. Declaration of Att'y Daniel P. Reing [hereinafter Reing Decl.], Ex. 58. At least one member of the Committee, Supervisor Kurtz, cited as among the problems with the application T-Mobile's failure to adequately pursue preferred alternatives to the construction of a new monopole, *i.e.*, existing structures within the immediate vicinity. *Id.* at 5. Supervisor Kurtz noted that the last contact T-Mobile had with the owners of the existing silos on Simpson Farm Lane was in 2009 and that the property was in foreclosure at that time. *Id.* Supervisor Kurtz inferred that the property was no longer in foreclosure and concluded that T-Mobile had an existing alternative to the placement of a new monopole. *Id.* The Committee forwarded the applications to the Board without a

11

recommendation but made requests that T-Mobile revise its proposal further, including a request that the company "look at reducing the silo to 80 feet[.]" *Id.* at 34–35. T-Mobile responded on September 27, 2011, that it would need to conduct testing "to verify that coverage [could] be achieved at the reduced height." BOS-002659. T-Mobile stated that it "anticipate[d] being able to conduct an analysis of the Stephens Silo site in November at the earliest" and that it would notify the Board of the planned date for the analysis. BOS-002659–60.

At a special meeting held on October 17, 2011, the Board voted to overturn the Planning Commission's approval of a commission permit and to deny the Stephens Silo application. BOS-002630–31. The Board determined that the proposed facility was "not fully consistent with" the Telecom Plan, given the preference for collocation of telecommunications facilities on existing tall structures and the fact that there were existing silos within a two-mile radius of the proposed site. BOS-002630; *see also* Reing Decl., Ex. 61 at 4. The Board also found that T-Mobile "creat[ed] an unnecessary visual impact on surrounding properties" by failing to mitigate the "significant structural presence" of the proposed facility, and that the 90-foot height of the proposed facility did not blend with the surrounding area. BOS-002630; *see also* Reing Decl., Ex. 61 at 4–5.

At the special meeting, Supervisor Miller moved to amend the list of reasons for denying the special exception "notwithstanding the prohibition on [his proposal in] the Telecommunications Act of 1996." Reing Decl., Ex. 61 at 5. Supervisor Miller asked that "negative environmental impact" be added as another reason for denying the Stephens Silo application. *Id.* After the motion was accepted and seconded, Supervisor Miller provided further comment:

> Mr. Chairman, the reason I want to include that is because it is a prohibited basis
> under the Telecommunications Act . . . for local government to consider. We've

had speaker after speaker come in here and talk to us about their concerns of being exposed to radiation from an evolving, dynamic technology. . . .

Governments at our level all over the country do the same thing when they decide that's the reason to turn down one of these application [*sic*]: They lie. They give a reason that's on the legal list when that's not what's on their mind.

I want this decided in a court of law that will be asked the question, Do we have the right to look at something that Congress closed its eyes to 15 years ago and in the context of an evolving technology where frequencies change, power levels change, radiation patterns change, and studies have been made available since that decision was made that there are risks to being exposed this close. Isn't it appropriate that we should have that power?

*Id.* at 6–7. After Supervisor's Miller's comment, the Board voted 7 to 2 in favor of his motion and amended the list of reasons for denying the Stephens Silo application to include "negative environmental impact." *Id.* at 8; *see also* BOS-002631.

### D. The Present Litigation

T-Mobile filed this civil action against the Board on November 3, 2011, alleging several violations of the federal Telecommunications Act of 1996 based on the Board's denials of the Bell Tower and Stephens Silo applications. In its Third Amended Complaint, T-Mobile asserts claims under 47 U.S.C. § 332(c)(7)(B) in five counts: Count I for denying the Bell Tower application without the support of substantial evidence in the written record, in violation of 47 U.S.C. § 332(c)(7)(B)(iii); Count II for effectively prohibiting the provision of personal wireless services in denying the Bell Tower application, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II); Count III for denying the Bell Tower application on the basis of environmental effects of RF emissions, in violation of 47 U.S.C. § 332(c)(7)(B)(iv); Count IV for denying the Stephens Silo application without the support of substantial evidence in the written record, in violation of 47 U.S.C. § 332(c)(7)(B)(iii); and Count V for effectively prohibiting the provision of personal wireless services in denying the Stephens Silo application, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). T-Mobile seeks an injunction directing the Board to approve its applications,

and a declaratory judgment that the Board's decisions violated the Telecommunications Act and are therefore void. Third Am. Compl. at 33.

The parties filed cross-motions for summary judgment as to all claims on July 20, 2012. The Court heard oral argument on September 14, 2012, and took the matter under advisement. In this Memorandum Opinion, the Court sets forth its ruling on the parties' summary judgment motions.

## II. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material" fact

14

arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248.

## III.    ANALYSIS

### A. Article III Standing (Counts I, II, and III)

In its Motion for Summary Judgment, the Board argues that T-Mobile lacks standing under Article III of the United States Constitution to assert claims arising from the Board's denial of the Bell Tower application. The Court rejects this argument because T-Mobile has shown that it has suffered an injury in fact that may be redressed by a ruling from the Court to invalidate the Board's decision.

Article III requires that the claimant in federal court allege "'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). "[I]n order to have standing, a party must be able to demonstrate a 'distinct and palpable injury' that is likely to be redressed if the requested relief is granted." *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 488 (1982)). Specifically, the U.S. Supreme Court has held that,

> to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In this case, T-Mobile's standing to assert claims against the Board for denial of the Bell Tower application is based on the company's lease agreement with the Church. The lease agreement grants T-Mobile an option to lease a "tower" to be constructed on a portion of the Church's property for the placement and use of telecommunications facilities. TM-002424. The drawing attached to the agreement indicates that the tower will consist of an 80-foot flag pole at the southwest corner of the Church's property. TM-002431. The attachment indicates, however, that "[t]he purpose of this drawing is for concept only" and that "[a]ll dimensions and/or locations are approximate." *Id.* The agreement also obligates the Church to cooperate with T-Mobile's efforts to obtain the necessary permits to install its wireless facility. TM-002424. Feedback from Planning Department staff and community members as it pursued a commission permit and special exception to build its facility ultimately caused T-Mobile to amend its proposal to an 80-foot bell tower design. BOS-002014. T-Mobile also proposed placing the facility at a slightly different location, a grass island in the Church's parking lot. *Id.* These changes were made in an effort to mitigate the visual impact of the facility and have it blend more effectively with its surroundings as required by the Loudoun County Zoning Ordinance and Telecom Plan. *See* Z.O. § 5-618(B)(3)(a) (requiring telecommunications monopoles to be "compatible with development in the vicinity with regards to the setting, color, lighting, topography, materials and architecture"); Z.O. § 5-618(B)(3)(g) (requiring monopoles to "blend with the background"); BOS-022341 ("The visual impact of commercial public telecommunications facilities should be mitigated so as to blend with the natural and built environment of the surrounding area.").

T-Mobile meets the requirements for Article III standing with respect to its claims based on the Board's denial of the Bell Tower application. The Board argues that T-Mobile lacks

standing to bring suit for denial of the Bell Tower application because its lease agreement does not give it an option to lease the facility proposed in the Bell Tower application. Br. Supp. Def.'s Mot. Summ. J. at 24–26; Resp. to Pl.'s Mot. Summ. J. at 5–6. The Board notes that the facility proposed in the Bell Tower application is of a different design and at a different location than the facility described in the lease agreement. Br. Supp. Def.'s Mot. Summ. J. at 25. However, the lease agreement provides notice to the Church that the specific design and location of the facility were "approximate" and requires the Church to cooperate with T-Mobile's efforts to secure the necessary permits. TM-002424, -002431. Therefore, T-Mobile's efforts to ensure compliance with local zoning policies by revising the precise design and location of its proposed facility did not remove its property interest in the option to lease the Church's property. T-Mobile's property interest in its option lease was harmed when the Board denied its request to build the facility. Finally, the injury to T-Mobile's property interest may be redressed by a favorable ruling from the Court in this action, in which T-Mobile seeks reversal of the Board's decision and a determination that the decision is void under the federal Telecommunications Act. The Court holds that T-Mobile has shown a redressible injury in fact arising from denial of the Bell Tower application and therefore has standing under Article III to assert claims in this Court based on the denial.

## B. Effective Prohibition of Service (Count II)

The Court grants the Board summary judgment on T-Mobile's effective prohibition of service claim because T-Mobile cannot show that the Bell Tower application was denied pursuant to a general policy to reject of all wireless facility applications, or that denial of the Bell Tower application was tantamount to such a general prohibition.

17

The federal Telecommunications Act of 1996 provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II) (2012). A plaintiff may "prevail in asserting a violation of [47 U.S.C. § 332(c)(7)(B)(i)(II)] by showing that [1] a local governing body has a general policy that essentially guarantees rejection of all wireless facility applications"; or "[2] the denial of an application for one particular site is 'tantamount' to a general prohibition of service." *T-Mobile Northeast LLC v. Fairfax Cnty. Bd. of Supervisors*, 872 F.3d 259, 266 (4th Cir. 2012) (citing *360° Commc'ns Co. of Charlottesville v. Bd. of Supervisors of Albemarle Cnty.*, 211 F.3d 79, 86, 87–88 (4th Cir. 2000)). A plaintiff's burden to prove a prohibition of wireless service "is substantial and is particularly heavy when, . . . the plaintiff already provides some level of wireless service to the area" and bases its claim on the denial of a permit for a particular site. *Fairfax Cnty.*, 872 F.3d at 268 (citing *Albemarle Cnty.*, 211 F.3d at 87–88); *see also USCOC of Va. RSA #3, Inc. v. Montgomery Cnty. Bd. of Supervisors*, 343 F.3d 262, 268 (4th Cir. 2003). "[C]ase-by-case denials of permits for particular sites cannot, without more, be construed as a denial of wireless services" in violation of subparagraph B(i)(II). *Albemarle Cnty.*, 211 F.3d at 86.

In asserting a claim that the denial of an application for a particular site effectively prohibits service, "a plaintiff must show [1] a legally cognizable deficit in coverage amounting to an effective absence of coverage, and [2] that it lacks reasonable alternative sites to provide coverage." *Fairfax Cnty.*, 872 F.3d at 268 (citing *Albemarle Cnty.*, 211 F.3d at 87–88). In order to prove effective prohibition of services where the defendant presents alternatives to the plaintiff's proposed site, the plaintiff must "demonstrate that further reasonable efforts to gain

approval for alternative facilities would be 'fruitless.'" *New Cingular Wireless PCS, LLC v. Fairfax Cnty. Bd. of Supervisors (New Cingular II)*, 674 F.3d 270, 277 (4th Cir. 2012) (quoting *Fairfax Cnty.*, 872 F.3d at 268). This burden is satisfied only where the plaintiff shows that reasonable efforts to obtain approval for the alternative sites "would be 'so likely to be fruitless that it is a waste of time to try.'" *New Cingular II*, 674 F.3d at 277 (quoting *Montgomery Cnty.*, 343 F.3d at 268).

The U.S. Court of Appeals for the Fourth Circuit has stated that subparagraph B(i)(II) "does not encompass the ordinary situation in which a local governing body's decision merely limits the level of wireless services available." *Fairfax Cnty.*, 872 F.3d at 268. The statute does not require wireless service providers to be afforded 100% coverage. *Albemarle Cnty.*, 211 F.3d at 87. Thus, "the denial of a single application to provide wireless service cannot give rise to a prohibition of service claim merely because the proposed telecommunications facilities are intended to provide or improve service where gaps exist." *New Cingular Wireless PCS, LLC v. Fairfax Cnty. Bd. of Supervisors (New Cingular I)*, 2010 WL 4702370, at *9 (E.D. Va. Nov. 10, 2010), *aff'd*, 674 F.3d 270 (4th Cir. 2012). *See also T-Mobile Northeast LLC v. Howard Cnty. Bd. of Appeals*, Civil Action No. RDB–11–729, 2012 WL 1123043, at *10 (D. Md. Mar. 30, 2012) (denying T-Mobile's motion for summary judgment on its effective prohibition claim where T-Mobile showed that it "had unreliable coverage in the area" but "coverage was not completely lacking"). Moreover, a plaintiff does not meet its heavy burden of proving that the denial of a particular application is tantamount to a prohibition of service by merely showing that alternative sites would not fully remedy a deficiency in coverage or provide the same level of service as the proposed facility. *Fairfax Cnty.*, 872 F.3d at 269.

Here, T-Mobile cannot show that, in denying the Bell Tower application, the Board effectively prohibited the provision of wireless services. First, T-Mobile fails to offer evidence showing that the Board has a general policy or practice that guaranteed rejection of T-Mobile's application. The Board has presented documentation of having approved 63 wireless facility applications made by T-Mobile. BOS-002903–05. T-Mobile has presented no evidence showing that the Board enforces any policy or engages in a general practice of barring the construction or installation of wireless facilities.

Second, evidence in the record before the Court demonstrates that T-Mobile does not have "a legally cognizable deficit in coverage amounting to an effective absence of coverage" in the vicinity of the proposed Bell Tower site. *Fairfax Cnty.*, 872 F.3d at 268. T-Mobile has coverage in the area surrounding the Bell Tower site, which is served by seven existing T-Mobile wireless sites. Expert RF Report of Richard Conroy [hereinafter Conroy Report], Ex. A; BOS-004039A, -004053A. The report and data submitted by T-Mobile's own RF engineering expert, Richard Conroy, show that personal wireless service is available from T-Mobile in this area. *See generally* Conroy Report. According to the Board's wireless service expert, Christine Malone, "[t]here is no absence of wireless service in the area around the Bell Tower Site." Report of Christine A. Malone at 10 [hereinafter Malone Report].

Conroy concedes that "T-Mobile has some level of wireless service in the area," Dep. of Richard Conroy at 99 [hereinafter Conroy Dep.], but opines that T-Mobile's in-building coverage in the relevant area is not reliable, Conroy Report at ¶¶ 2,4,13. According to Conroy, "T-Mobile has an area in which, due to inadequate radio frequency signal coverage, it is not able reliably to provide wireless service to customers inside buildings." *Id.* at ¶ 2. Convoy's performance and access failure data shows that the dropped call rate inside buildings in the

relevant area does not exceed 1.82%, and the access failure rate does not exceed 2.8%. Conroy Report, Ex. E. However, according to Conroy, "a dropped call rate greater than 1% or an access failure rate greater than 2% is a measure of unreliable wireless coverage." *Id.* at ¶ 27. Signal propagation coverage maps and test data provided by Conroy shows that the vicinity of the proposed Bell Tower site lacks "reliable in-building residential coverage" and that reliability would be enhanced by placement of the proposed site. *Id.* at ¶¶ 13–25, Exs. A–D. Indeed, in various submissions to Loudoun County, T-Mobile described its objective in establishing the Bell Tower site as the improvement or enhancement its existing in-building coverage in the vicinity of the proposed site. *See, e.g.*, BOS-001775, -002530. Malone contends that "[a]ctual in-building service is greater than indicated in T-Mobile's propagation maps, drive tests, and expert reports," but agrees that ""[i]n-building service is . . . present but less pervasive and reliable" than outdoor and in-vehicle service. Malone Report at 9.

While the expert opinions presented to the Court show that T-Mobile's wireless service in the vicinity of the Bell Tower site is not fully reliable, the standard of reliability employed by the experts is a standard devised by T-Mobile itself. Malone notes that "the definition of 'reliable' service are targets/objectives set by T-Mobile," *id.*, and that T-Mobile's standard for reliable in-building service is "comparable to the thresholds that other wireless carriers use," Malone Dep. at 91. T-Mobile's expert on wireless service consumer experience and behavior, Roger Entner opines that "reliable in-building wireless service is essential for wireless users." Expert Report by Roger Entner at ¶ 18 [hereinafter Entner Report]. Entner states further that "if a provider . . . is unable to provide reliable in-building wireless service in an area then . . . as far as consumers in that area are concerned the provider is effectively not providing service to them in that area." *Id.* According to Entner, reliable wireless service would allow consumers to make

calls "whenever and wherever" within the relevant area "100% of the time." Dep. of Roger Entner at 27–28 [hereinafter Entner Dep.].

The evidence offered by T-Mobile is inadequate to show "a legally cognizable deficit in coverage amounting to an effective absence of coverage" in the vicinity of the Bell Tower site, as required to prove effective prohibition of service based on denial of the Bell Tower application. *Fairfax Cnty.*, 872 F.3d at 268. Standards of reliability invented by T-Mobile, customarily observed in the wireless service industry, or generally expected by consumers of wireless services do not constitute the standard for "the provision of personal wireless services" protected under 47 U.S.C. § 332(c)(7)(B)(i)(II). The Fourth Circuit Court of Appeals has not directly resolved the question of precisely what minimum level of wireless service is adequate under subparagraph B(i)(II). However, the Fourth Circuit has held, as the district courts in this circuit have recognized, that "a legally cognizable deficit in coverage" is one that "amount[s] to an effective absence of coverage." *Fairfax Cnty.*, 872 F.3d at 268; *see also, e.g., Howard Cnty.*, 2012 WL 1123043, at *10. A dropped call rate of 1.82% and access failure rate of 2.8% in buildings within a geographic area do not amount to an effective absence of coverage. *See Howard Cnty.*, 2012 WL 1123043, *10 (finding no legally cognizable deficit where "Conroy had catalogued [dropped call] rates of 5.42 percent, 6.26 percent and 2.68 percent in the area over a three months period"). The Court cannot read the 100% reliability standard offered by T-Mobile and its experts into subparagraph B(i)(II). *See Albemarle Cnty.*, 211 F.3d at 87 (statute does not require wireless service providers to be afforded 100% coverage).

Third, T-Mobile fails to show "that it lacks reasonable alternative sites to provide coverage" in the area surrounding the Bell Tower site. *Fairfax Cnty.*, 872 F.3d at 268. In her expert report, Malone identifies alternative sites "that could provide enhanced in-building service

in the vicinity of the Bell Tower Site using existing structures," including commercial buildings, Malone Report at 13, as preferred by Loudoun County zoning policies. *See* Z.O. § 5-618(B)(4)(b); BOS-022338 (Telecom Plan). Malone opines that a combination of two sites, one to the northeast and another to the southwest of the Bell Tower site, "would provide enhanced in-building service to an even greater area than the Proposed Facility." Malone Report at 13. In response to Malone's report, T-Mobile's expert Conroy performed a signal propagation study on a combination of alternative sites identified by Malone, a restaurant located northeast of the Bell Tower site and a food store southwest of the site. Conroy Dep. at 141–42. Conroy determined that the alternative sites "provide[d] some improvement in coverage." *Id.* at 143.

The Court rejects T-Mobile's argument that the alternative sites identified by Malone are inadequate. T-Mobile argues that the alternative sites are not "of sufficient height to provide for viable collocation options to meet T-Mobile's coverage needs, and using multiple sites will not provide the coverage Ms. Malone asserts." Reply Supp. Pl.'s Mot. Summ. J. at 20. The Court has described the evidence in the record showing that T-Mobile has coverage in the area at issue here. Considering Conroy's testimony that the alternative sites would improve coverage in the area, the Court infers that, by "coverage needs," T-Mobile refers to its own standard for in-building reliability. T-Mobile disputes whether the alternative sites would allow it to attain its preferred level of reliability of service in the area. However, the question of whether the Board's denial of the Bell Tower application effectively prohibits service does not turn on whether alternative sites provide the same level of coverage as the proposed site. *See Fairfax Cnty.*, 872 F.3d at 269 ("T-Mobile cannot meet its burden of proving that [the local governing body's] denial was 'tantamount' to a general effective prohibition on services by showing merely that the alternative sites would not close the entire deficiency in coverage, or would not provide the same

level of service as the proposed facility."). Evidence in the record shows that alternative sites are available to T-Mobile that would allow it to improve the level of its wireless service in the area covered by the proposed Bell Tower site.

The Court also rejects T-Mobile's argument that seeking to place wireless facilities at the alternative sites would be futile given their location "in residential zones with more restrictive zoning than the Church property." Reply Supp. Pl.'s Mot. Summ. J. at 20. The alternative sites identified by Malone are in "PD-H" zoning districts where, unlike the CR-1 district in which the proposed Bell Tower site is located, free-standing telecommunications monopoles and towers are generally prohibited. Z.O. § 5-618(B)(3)(l), (C)(3)(l). However, the alternative sites would not require the construction of free-standing monopoles or towers, but would require the collocation of T-Mobile's wireless facilities on existing buildings, a preferred location under the County's Telecom Plan. *See* BOS-022338 (Loudoun County's first preference for telecommunications facilities is "to have new antennas collocate on existing tall structures, monopoles and towers in order to minimize the need for new towers and monopoles."). T-Mobile cites no provision in the Zoning Ordinance or Comprehensive Plan suggesting that any efforts to collocate wireless facilities on the existing structures identified by Malone would be "fruitless." *Fairfax Cnty.*, 872 F.3d at 269.

Thus, T-Mobile fails to show "that it lacks reasonable alternative sites to provide coverage" in the area surrounding the Bell Tower site, and therefore fails to show that the Board's denial of the Bell Tower application was tantamount to a general prohibition on services. *Fairfax Cnty.*, 872 F.3d at 268. At best, T-Mobile has shown that the Board's decision on the Bell Tower applications effectively "limits the level of wireless services available" from T-Mobile in the vicinity of the proposed site. *Id.* T-Mobile has not carried its "particularly

24

heavy" burden of showing that the Board's decision effectively "prohibit[s] the provision of personal wireless services" from T-Mobile in that area. *Id.*

Evidence in the record before the Court shows that there is no deficit in coverage that amounts to an absence of service in the area and that alternative sites were available to T-Mobile for the enhancement of its coverage in the area. T-Mobile fails to create a genuine issue for trial on its effective prohibition of service claim. For this reason, the Court holds that the Board is entitled to judgment as a matter of law on Count II of T-Mobile's Third Amended Complaint and grants the Board's Motion for Summary Judgment as to Count II.

## C. Substantial Evidence (Counts I and IV)

The Court grants the Board summary judgment on T-Mobile's substantial evidence claims because there was substantial evidence in the record before the Board supporting its decisions to deny the Bell Tower and Stephens Silo applications.

The Telecommunications Act requires that the decision of a local governing body "to deny a request to place, construct, or modify personal wireless service facilities . . . be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Courts have interpreted "substantial evidence" to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *AT & T Wireless PCS v. City Council of Va. Beach*, 155 F.3d 423, 429 (4th Cir. 1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951)). Substantial evidence "is more than a scintilla" but "less than a preponderance." *Va. Beach*, 155 F.3d at 429 (citation omitted). The substantial evidence requirement in 47 U.S.C. § 332(c)(7)(B)(iii) may be satisfied by "a proposed telecommunications facility's inconsistency with local zoning requirements" or "negative impact on the neighborhood." *New Cingular II*, 674 F.3d at 274 (citations and internal quotation marks

25

omitted). In determining whether the substantial evidence requirement is satisfied, the court cannot substitute its judgment for that of the local governing body. *Va. Beach*, 155 F.3d at 429 (citation omitted). The Fourth Circuit has stated that the court should keep in mind the distinction between the "reasonable mind" of a legislator and that of a bureaucrat when reviewing the decision of a local governing body acting in a legislative capacity. *Id.*

> It is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence, in zoning as in all other legislative matters. These views, if widely shared, will often trump those of bureaucrats or experts in the minds of reasonable legislators.

*Id.*

With these considerations in mind, the Court holds that there was substantial evidence in the written record before the Board that supported denial of both the Bell Tower and Stephens Silo applications at issue in this case.

### 1. The Bell Tower Site (Count I)

There was substantial evidence before the Board supporting denial of the Bell Tower application. T-Mobile's initial application for a facility at the Church failed to obtain a recommendation from Planning Department staff due in part to negative visual impacts based on the height of the facility and its proximity to existing residences. BOS-000232–43. T-Mobile responded to concerns expressed by Planning Department staff by ultimately amending its proposal to a bell tower design with the same color scheme as the church building, so as to mitigate its visual impact. BOS-001867, -002014. However, the height of the facility was not reduced, and the proposed site remained within the predominantly residential area. BOS-000242–43. The Planning Department eventually recommended the Bell Tower applications for approval but continued to express concerns about the proposed site's negative visual impact on the area due to its height and proximity to residences. *Id.* Many residents of the area commented

to the Planning Commission and to the Board that the height of the Bell Tower site would be out of proportion with its built and natural environment and thereby create negative visual impact on their community and diminish the residential character of the area. BOS-004047A–52A; BOS-004004A–10A. The Planning Commission ultimately approved the commission permit application and recommended approval of the special exception application by a close 5-to-4 vote. BOS-022194.

The evidence before the Board showed substantial opposition to the Bell Tower applications among constituents and planning and zoning experts in the Planning Department and on the Planning Commission. The evidence also showed a significant likelihood that the proposed Bell Tower site would have negative visual impacts on the nearby residential community and be incompatible and out of proportion with surrounding land uses. These considerations were all legitimate and appropriate factors into the Board's decisions on whether to approve a commission permit and special exception for the Bell Tower site. *See Va. Beach*, 155 F.3d at 429 (local governing bodies may "consider the views of their constituents [as] particularly compelling forms of evidence[] in zoning . . . matters"); *New Cingular II*, 674 F.3d at 274 ("proposed telecommunications facility's inconsistency with local zoning requirements" or "negative impact on the neighborhood" constitute substantial evidence in support of denying zoning application); BOS-022336 (objectives of Telecom Plan include "ensur[ing] compatibility of telecommunications facilities with nearby land uses" and "establish[ing] siting and design criteria to mitigate negative impacts"); Z.O. § 5-618(B)(3)(g) ("monopoles shall blend with the background"). The substantial evidence provision in subparagraph B(iii) does not require the Board to automatically affirm the decisions of the Planning Commission or to automatically adopt the recommendations of Planning Department staff. This is particularly true where the

evidence before the Board shows that issues raised by Planning Department staff during the application process were not addressed. Here, staff's concerns about the proposed facility's height and proximity to residences did not result in responsive revisions to T-Mobile's proposal.

A reasonable mind could accept the evidence presented to the Board as adequate to support the Board's decision to deny the Bell Tower application. Therefore, the Court holds that the Board is entitled to judgment as a matter of law on Count I of T-Mobile's Third Amended Complaint and grants the Board's Motion for Summary Judgment as to Count I.

### 2. The Stephens Silo Site (Count IV)

Substantial evidence also supported the Board's denial of the Stephens Silo application. First, there was evidence before the Board showing that the proposed Stephens Silo facility would have a negative visual impact on, and was incompatible with, the area surrounding the site. Residents of the area surrounding the site objected to the facility before the Planning Commission and the Board based on negative visual impact, T-Mobile's failure to mitigate the visual impact, and the fact that the facility was out of proportion with nearby buildings and vegetation. BOS-022236–50. Planning Department staff had also expressed concerns about the height of the facility when T-Mobile proposed a height of 125 feet. BOS-002923. T-Mobile eventually revised its proposal to reduce the height to 90 feet, BOS-002669, but even this proposal was substantially taller than most silos in Loudoun County, which stand at between 40 and 60 feet tall. BOS-002923. Thus, the height of the facility remained a legitimate concern for residents of the area, and it was appropriate for the Board to consider this issue in deciding how to handle the Stephens Silo application. *See, e.g.*, Z.O. § 5-618(B)(3)(a) (monopoles must be compatible with development in the vicinity with regards to the topography and architecture).

Second, there was evidence before the Board that T-Mobile failed to pursue preferred locations for its facility. There are existing silos located approximately one-half mile from the proposed Stephens Silo site. Campbell Decl. at ¶ 7; BOS-001431. The Zoning Ordinance required T-Mobile to assess the feasibility of locating its wireless facilities on these existing structures before proposing a new monopole. *See* Z.O. § 5-618(B)(4)(b). T-Mobile represents that the property on which the existing silos are located was in foreclosure in 2009 and therefore considered the silos unavailable for siting its wireless facilities. Campbell Decl. at ¶ 7; BOS-001432, -002681, -002732. However, a publicly recorded deed of conveyance shows that the property on which the existing silos are located was sold in January 2011, BOS-003836, several months before the Planning Commission conducted hearings on the Stephens Silo applications. T-Mobile represented to Planning Department staff, in March 2011, that "[t]he property appear[ed] to still be in the process of foreclosure and there were attempts to verify this fact with the owner, to no avail." BOS-002825. T-Mobile did not explain why it believed that the property was still in foreclosure or what efforts were taken to confirm this belief. Moreover, there is no evidence in the record showing how or why a past foreclosure would preclude T-Mobile from pursuing the existing silos as a location for its wireless facility.

The Court is not persuaded by T-Mobile's argument that evidence that the property was sold in January 2011 was not in the record before the Board when it made its decision. *See* Pl.'s Opp'n to Def.'s Mot. Summ. J. at 24. Supervisor Kurtz's inference that the property was out of foreclosure years after T-Mobile discovered that the property was in foreclosure and last made contact with owners of the property was reasonable and turned out to be correct. *See* Reing Decl., Ex. 58 at 5.

The Court also rejects T-Mobile's argument that the existing silos were not tall enough to meet the company's coverage needs. *See* Pl.'s Opp'n to Def.'s Mot. Summ. J. at 24. T-Mobile represented to Planning Department staff and to this Court that it initially "proposed extending the height of the tallest silo" until it discovered the foreclosure proceedings. BOS-002825; *see also* Pl.'s Mem. Supp. Mot. Summ. J. at 9. T-Mobile fails to explain why extending the tallest of the existing silos was a feasible option for meeting its coverage objectives in 2009 but is no longer an option.

The Court concludes that a reasonable mind could accept the evidence presented to the Board as adequate to support the Board's decision to deny the Stephens Silo application. Again, section 332(c)(7)(B)(iii) does not require the Board to automatically affirm the decisions of the Planning Commission or to automatically adopt the recommendations of the Planning Department staff. Accordingly, the Court holds that the Board is entitled to judgment as a matter of law on Count IV of T-Mobile's Third Amended Complaint and grants the Board's Motion for Summary Judgment as to Count IV.

### D. Environmental Effects of RF Emissions (Counts III and V)

The Court grants the Board summary judgment on T-Mobile's § 332(c)(7)(B)(iv) claim based on the denial of the Bell Tower application, but grants summary judgment in favor of T-Mobile on its subparagraph B(iv) claim based on the denial of the Stephens Silo application. The Telecommunications Act bars local governments from "regulat[ing] the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communications] Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv). The evidence in the record before the Court shows that the Board's decision to deny the Stephens Silo application was, at least in part, impermissibly based on environmental

effects of RF emissions. There is no evidence, however, that the Board's decision to deny the Bell Tower application was made on this improper basis. Accordingly, the Court holds that the Board is entitled to summary judgment on Count III of T-Mobile's Third Amended Complaint, and T-Mobile is entitled to summary judgment on Count V.

### 1. The Bell Tower Site (Count III)

T-Mobile fails to present relevant evidence that the Board's decision to deny the Bell Tower application was either directly or indirectly based on environmental effects of RF emissions. Reasons given by the Board for its decision to deny the Bell Tower application was its location in a primarily residential community and T-Mobile's failure to mitigate the facility's visual impact on the area, BOS-003760, as required under Loudoun County zoning and planning policies, *see, e.g.*, BOS-022336, -022341 (Telecom Plan requires compatibility of telecommunications facilities with nearby land uses and mitigation of visual impact of these facilities). The Board did not cite environmental effects of RF emissions as a consideration or reason for its decision on the Bell Tower application.

T-Mobile cites a congressional conference report on the Telecommunications Act and a number of district court cases that stand for the proposition that subparagraph B(iv) prohibits denial of requests to build wireless service facilities *directly or indirectly* based on concerns about RF emissions. Pl.'s Opp'n to Def.'s Mot. Summ. J. at 11; *see also* H.R. REP. No. 104-458, 201 (1996) (Conf. Rep.). In *California RSA No. 4 v. Madera County*, a local government cited generalized aesthetic considerations and a decline in residential property values as reasons for denying the plaintiff a permit to build 30-foot antennae to provide wireless services. 332 F. Supp. 2d 1291, 1306–11 (E.D. Cal. 2003). The court found, first, that the generalized aesthetic considerations cited by the defendants were not supported by substantial evidence because the

small antennae would "not even be visible to the vast majority of the inhabitants of the area." *Id.*
at 1309. Second, the court found that, as the defendants conceded, "the concerns regarding
property values [could not] meaningfully be distinguished from a generalized fear of the possible
environmental effects of [RF emissions]." *Id.* at 1310. The evidence in the record, including
expert testimony, showed that the proposed facility would not negatively impact property values.
*Id.* at 1309. The defendants' argument to the contrary was predicated on the theory that public
perception of health risks associated with exposure to RF emissions would deter potential buyers.
*Id.* at 1310. Thus, the court determined, "complaints about property values were really a proxy
for concerns about possible environmental effects of [RF emissions.]" *Id.* at 1311.

Similarly, in *AT & T Wireless Services of California, LLC v. City of Carlsbad*, the court
rejected the City's argument that "aesthetic concerns" and "possible decline in property values"
justified denial of a permit to place, in a residential area, a wireless site disguised as a residence.
308 F. Supp. 2d 1148, 1160 (S.D. Cal. 2003). First, "substantial evidence [did] not support the
finding that the application was denied based on the aesthetic concerns" because only one person
who testified at hearings before the planning commission and city council stated that he could
see the facility and that it was an "eyesore." *Id.* at 1161. The record before the court showed that
public opposition to the application was primarily based on perceived health effects of RF
emissions. *Id.* at 1160–61. Additionally, the mayor made public statements when the city council
denied the plaintiff's application in which he essentially admitted that his vote was based on
concerns about RF emissions, over the city attorney's advice that this was not permitted. *Id.* at
1153–54, 1160. These facts supported the court's conclusion that aesthetics was a pretext for
denying the application "because it was known . . . that basing the decision on health concerns
would be unlawful." *Id.* at 1161. Second, there was no evidence in the record that the proposed

wireless facility would cause property depreciation. *Id.* at 1162. As in *Madera County*, the City's concerns over a decline in property values were specifically based on fears about RF emissions and therefore were not a legitimate basis for an regulating the placement of wireless facilities under the Telecommunications Act. *Id.*

Here, unlike *Madera County* and *Carlsbad*, T-Mobile offers no relevant evidence that the negative visual impact of the Bell Tower site was a pretext for denial of the Bell Tower application or that the denial was indirectly based on the environmental effects of RF emissions. First, the Board did not justify its denial of the Bell Tower applications by citing a decline in property values or any other issue that could be logically premised on RF emissions such that the Board's decision could be indirectly based on fears about RF emissions. The Board cited negative visual impact as a basis for its decision, BOS-003760, but there is no logical relationship between concerns about visual impact and concerns about the effects of RF emissions. Such a logical connection would permit the former to serve as a proxy for the latter, as property depreciation served as a proxy for health risks associated with RF emissions in both *Madera County* and *Carlsbad*. *See Madera Cnty.*, 332 F. Supp. 2d at 1311; *Carlsbad*, 308 F. Supp. 2d at 1162. Concerns about visual impact cannot be premised on health risks associated with RF emissions the way a decline in property values can be premised on such health concerns.

Second, there was substantial evidence in the record before the Board that the Bell Tower site would have a negative visual impact on the surrounding residential area.[2] The evidence before the Board demonstrated that the height of T-Mobile's proposed facility was out of proportion with the surrounding residential area. BOS-000242–43. Throughout the period in which they assessed the Bell Tower application, Planning Department staff noted that the height of the facility and its proximity to residences were problematic. *Id.* Area residents expressed

---

[2] *See supra* subpart C.1.

concerns about the negative visual impact of the proposed facility and its incompatibility with the surrounding area before the Planning Commission and the Board. BOS-003961A–4023A, -004047A–52A. Some residents also commented about the health effects of RF emissions, BOS-004004A, -004010A, but there is no evidence that this issue predominated community opposition to the wireless site, as it had in *Madera County* and *Carlsbad*. *See Madera Cnty.*, 332 F. Supp. 2d at 1310; *Carlsbad*, 308 F. Supp. 2d at 1160–61. Thus, despite its stealth bell tower design and color scheme to match the church building, the sheer size and visibility of T-Mobile's proposed facility clearly distinguish it from the stealth placements at issue in *Madera County* and *Carlsbad*. The evidence before the Board could support a reasonable conclusion that T-Mobile failed to mitigate the visual impact of the facility.

T-Mobile argues that the Board's possibly mistaken understanding about the Church's right to construct a bell tower on its property proves that denial of the Bell Tower application was really based on effects of RF emissions. Pl.'s Mem. Supp. Mot. Summ. J. at 22; Reply Supp. Pl.'s Mot. Summ. J. at 9. The letter from the Planning Commission to the Board presenting the Planning Commission's decision on the Bell Tower application stated that the Church could, by right, construct a 74-foot bell tower at the location proposed for the Bell Tower site. BOS-001769. The parties dispute whether this statement was true, but it tends to show that the Board understood that the Church could, by right, build a bell tower nearly the same height as, and otherwise visually identical to, T-Mobile's proposed facility.

Accepting that the Board had this understanding, however, does not warrant the conclusion that visual impact was not a genuine basis for the Board's decision or that the decision was really based on concerns about RF emissions. Even the Planning Commission's letter cited by T-Mobile notes "strong disagreement" among the Commissioners "over whether,

34

in this instance, a *virtual* bell tower should be treated the same as an *actual* bell tower." BOS-001769 (emphasis in original). Indeed, there are legitimate reasons completely unrelated RF emissions for treating the virtual bell tower sought in T-Mobile's application differently than an actual bell tower the Church might construct by right. For instance, T-Mobile and the Church, through its lease agreement with T-Mobile, have commercial motivations to build the virtual bell tower at issue here that would be absent in a scenario where the Church considers placing an actual bell tower on its property. Without such commercial motivation, the visual impact a 74-foot or 80-foot bell tower would have on the neighboring community might be enough to deter the Church from exercising any right it has to build such a structure. Negative visual impact and community opposition based on this impact may not be enough to contain a commercially motivated proliferation of telecommunications towers without regulation by local governments. Local governing bodies and land use policies play a legitimate role in limiting commercially motivated land uses that result in, but are undeterred by, negative visual impacts. Such efforts to contain the proliferation of telecommunications towers have nothing to do with perceived environmental effects of RF emissions. Thus, the Court holds that the Board's understanding about the Church's right to build an actual bell tower on its property cannot, without more, support a reasonable inference that denial of the Bell Tower applications was based on concerns about RF emissions.

Similarly, comments made by Supervisor Miller in connection with the Board's vote on the Stephens Silo application do not show that the Board's decision on the Bell Tower application was based on effects of RF emissions. At the public hearing on the Stephens Silo application, Supervisor Miller stated that, when concerned about the environmental effects of RF emissions, the Board cites permissible reasons for denying wireless facility applications as

subterfuge for the true and unlawful reason for the denial. Reing Decl., Ex. 61 at 6–7. Supervisor Miller did not identify the Bell Tower application or any other particular application as specific cases where, according to him, the Board was concerned about RF emissions but offered pretextual reasons to deny the applications. One would have to draw additional and unsupported inferences in order to conclude that the Board's denial of the Bell Tower applications was based on concerns about RF emissions. If the Court were to find comments about the Stephens Silo application relevant to the Board's decision on other applications to construct wireless sites, then every past and future denial of such applications would create a potential cause of action against the Board under § 332(c)(7)(B)(iv). The Court holds that Supervisor Miller's comments on the Stephens Silo application do not create a genuine issue as to whether the Board's decision on the Bell Tower application was impermissibly based on environmental effects of RF emissions.

Finding no genuine issue as to whether the Board denied the Bell Tower applications based on concerns about RF emissions, the Court concludes that the Board is entitled to summary judgment on Count III of T-Mobile's Third Amended Complaint.

### 2. The Stephens Silo Site (Count V)

T-Mobile is entitled to summary judgment on Count V because it demonstrates that the Board's decision to deny the Stephens Silo application was, at least in part, based on the environmental effects of RF emissions. During the Board's consideration of the Stephens Silo application, at least one member of the Board, Supervisor Miller, showed specific interest in the health effects of RF emissions and the legality of considering this issue. BOS-022259. At the final public hearing on the application, the Board cited legitimate and permissible reasons for denying T-Mobile's application, including T-Mobile's failure to pursue collocation on existing silos within a two-mile radius of its proposed site, the height of the proposed facility, and T-

Mobile's failure to mitigate its "unnecessary visual impact" on the surrounding area. BOS-002630; *see also* Reing Decl., Ex. 61 at 4–5. Supervisor Miller proposed an amendment to add "negative environmental impact" as an additional reason, noted concerns expressed by County residents about radiation from wireless telecommunications technology, and warned that the amendment he offered was prohibited by the Telecommunications Act. Reing Decl., Ex. 61 at 5–6. The Supervisor even commented that the Board and other local governing bodies deny wireless facility applications on the prohibited basis of environmental impact but cite permissible reasons as subterfuge for their true concerns. Reing Decl., Ex. 61 at 6–7. Despite Supervisor Miller's admission to violating of federal law, the Board finally adopted his proposed amendment by a 7-to-2 vote. *Id.* at 8. The Board's written decision included "negative environmental impact" as a basis for denying a special exception for the Stephens Silo facility. BOS-002630–31. This evidence demonstrates that environmental effects of RF emissions were at least one of several bases for the Board's decision to deny the Stephens Silo application.

No circuit court interpreting the Telecommunications Act has directly addressed the question of whether a local governing body may lawfully deny a request to place wireless service facilities based in part on environmental effects of RF emissions and in part on permissible reasons. Here, the parties cite district court cases that diverge on this issue: *Iowa Wireless Services, L.P. v. City of Moline, Illinois*, 29 F. Supp. 2d 915 (C.D. Ill. 1998), and *T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d 446 (S.D.N.Y. 2009). The *Moline* court interpreted 47 U.S.C. § 332(c)(7)(B)(iv) to forbid "the denial of a permit on the *sole* basis that the facility would cause negative environmental effects." 29 F. Supp. 2d at 924 (emphasis added). The court granted the City's motion for summary judgment on the plaintiff's subparagraph B(iv) claim because the City "articulated other reasons besides that of

environmental concerns" in its decision denying the plaintiff's application. *Id.* The *Ramapo* court, however, expressly rejected the approach taken in *Moline* and held that "any decision actually based on environmental effects is a violation, whether other legitimate reasons factored into the decision or not." 701 F. Supp. 2d at 460. The court granted T-Mobile's motion for summary judgment on its subparagraph B(iv) claim because "the Town's decision was at least partly based on the environmental effects of the proposed tower's radio frequency emissions." *Id.*

The Court notes, like the court in *Ramapo*, that subparagraph B(iv) does not include the words "sole" or "solely," and agrees with the *Ramapo* court that "the better and more straightforward reading of the provision" bars denial based even partially on the environmental effects of RF emissions. *Id.* Here, it is clear from the Board's written decision on the Stephens Silo application, as well as the transcript of the hearing on the application, that the Board's decision was based at least in part on concerns about the environmental effects of RF emissions. The Board offers no evidence to create a genuine issue as to whether its decision to deny the application was made on this impermissible basis.

The Court rejects the Board's argument that the wording of Supervisor Miller's amendment as "negative environmental impact" was ambiguous and, therefore, his concerns about RF emissions cannot be imputed to the Board. *See* Resp. to Pl.'s Mot. Summ. J. at 24–25. Supervisor Miller removed all ambiguity from the term "negative environmental impact" during his commentary in support of the amendment. *See* Reing Decl., Ex. 61 at 6–8. After his comments, the Board voted to accept the amendment without further comment that would support an inference that other members of the Board accepted the stated basis of Supervisor Miller's proposal. *Id.* at 8. The Board cites no evidence suggesting that any member of the Board

intended "negative environmental impact" to have a different meaning than that assigned by Supervisor Miller: negative environmental effects of radiation from wireless sites. After Supervisor Miller proposed the amendment, Supervisor Kurtz stated briefly, "I can accept it. Just that word, 'negative'—number four, 'negative environmental impact,' okay." Reing Decl., Ex. 61 at 6. This brief comment came before Supervisor Miller explained his proposal at length and admitted to proposing that the Board purposefully violate the Telecommunications Act. Supervisor Kurtz's brief comment cannot support an inference that the Board did not accept the "negative environmental impact" amendment as an invitation to violate federal law. The Court concludes that, when it voted to accept Supervisor Miller's amendment, the Board did accept an invitation to adopt an unlawful basis for denying T-Mobile's application.

The Board also argues that its decision on the Stephens Silo application is justified by treating denial of the commission permit and denial of the special exception as two separate decisions. Resp. to Pl.'s Mot. Summ. J. at 24. Each of these decisions, the Board argues, was based on separate sets of findings, and the finding of "negative environmental impact" was made in connection with the special exception but not the commission permit. The Board concludes that there was nothing improper about its denial of the commission permit and, because a commission permit is a prerequisite for a special exception, the special exception must be denied. *See* Z.O. § 5-618(B)(3)(j) (requiring commission permit in order to obtain special exception).

Upon review of the evidence in the record, the Court concludes that the Board's denial of the commission permit and special exception for the Bell Tower site constituted a single unlawful decision that cannot be justified by division into two separate decisions. T-Mobile's application for a commission permit and special exception to construct the proposed facility was a single application submitted to the Loudoun County Planning Department. BOS-001426, -

39

003175. In numerous correspondences, both T-Mobile and Planning Department staff referred to T-Mobile's application for a commission permit and special exception as a singular application. *See, e.g.*, BOS-000721, -000838, -002659. The Stephens Silo application was accepted for processing and referred to the Planning Commission and to the Board as a single application. BOS-000838, -001437–38, -002669–73. The Board ultimately denied both the commission permit and the special exception for the Stephens Silo site in a single written decision. BOS-002630–31.

The Board's single action to deny T-Mobile's application to construct a wireless service facility on the Stephens Farm was based at least in part on concerns about environmental effects of RF emissions. Without any evidence that the proposed facility failed to comply with FCC regulations on RF emissions, the Board's action constituted a violation of § 332(c)(7)(B)(iv). For these reasons, the Court holds that T-Mobile is entitled to summary judgment on Count V of its Third Amended Complaint.

### E. Remedy

The Court holds that T-Mobile is entitled to an injunction ordering authorization of the Stephens Silo site. Under 47 U.S.C. § 332(c)(7)(B)(v), courts are required to "hear and decide . . . on an expedited basis" an action brought by "[a]ny person adversely affected by any final action . . . by a State or local government . . . that is inconsistent with [subparagraph B.]" The statute does not prescribe specific remedies for violations of § 332(c)(7)(B). This Court and numerous other courts have held that the goal of expediting resolution of actions brought under subparagraph B is best served by an injunction ordering issuance of the unlawfully denied permits necessary for construction. *See, e.g., T-Mobile Northeast LLC v. City Council of City of Newport News, Va.*, Action No. 4:10CV82, 2011 WL 1086496, at *8–9 (E.D. Va. Feb. 4, 2011)

40

(citing cases); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999) (citing cases); *SPRINTCOM, Inc. v. P.R. Regulations & Permits Admin.*, 553 F. Supp. 2d 87, 96 (D.P.R. 2008) (injunction directing local governing body to authorize construction as proper remedy where denial of application is based on health effects of RF emissions) (citing *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14 (1st Cir. 2002)); *Carlsbad*, 308 F. Supp. 2d at 1166–67 (writ of administrative mandamus ordering local government to grant permit application as appropriate remedy for violations of § 332(c)(7)).

An injunction ordering the Board to issue the permits requested for T-Mobile's proposed facility at the Stephens Farm is an appropriate remedy for the Board's unlawful denial of these permits. Recognizing the Board's general authority over local zoning and planning matters, the Court has carefully considered whether such an injunction would force Loudoun County endure a land use that violates its zoning and planning policies. Based on evidence in the record before it, the Board could have reasonably denied the Stephens Silo application on lawful grounds,[3] but there was also substantial evidence supporting approval of the application. Upon review of T-Mobile's initial application for a 125-foot stealth silo facility, staff of the Loudoun County Planning Department found that the interior location and stealth design of the proposed facility were in conformance with the Comprehensive Plan and "sensitive to the surrounding rural agricultural landscape." BOS-002933. "[T]he 'stealth' design [was] a viable alternative to traditional monopole construction that [would] help blend the facility with the agricultural character of the [surrounding area]." BOS-002925. Planning Department staff ultimately recommended approval of the Stephens Silo application. BOS-002669. After T-Mobile's proposal was amended to a 100-foot facility, the Planning Commission voted to approve a commission permit for the site and to recommend approval of a special exception. BOS-022209.

---

[3] *See supra* subpart C.2.

41

This evidence demonstrates that there are legitimate grounds for approval of the Stephens Silo application, and an injunction ordering approval would not be an abuse of this Court's remedial power.

Remanding this matter to the Board for reconsideration would be an inadequate remedy in this case. The Board was aware that environmental effects of RF emissions were an unlawful basis for denying the Stephens Silo application at the time in rendered the decision challenged in this action. Indeed, Supervisor Miller put the Board on notice that what he proposed was a violation of the Telecommunications Act immediately before the Board accepted his amendment. A remand cannot reasonably be expected to serve any useful and legitimate purpose in this case. The evidence before the Court urges the conclusion that a remand would result in the Board simply justifying denial of the Stephens Silo application by citing the same permissible reasons listed in the written decision challenged in this action. The Court is not satisfied that this decision would be valid under the Telecommunications Act, particularly in light of Supervisor Miller's comment that the Board falsely cites lawful reasons as pretexts for unlawfully denying permit applications and the Board's silent approval of Supervisor Miller's proposal. A remand would simply invite the Board to violate the § 332(c)(7)(B) again while concealing its violation with false justifications for denying T-Mobile's application. *See Nat'l Tower*, 297 F.3d at 24–25 (remand is not appropriate remedy where "the only fair inference from the board's words and actions . . . is that . . . the board is not prepared to permit construction on [the plaintiff's] chosen site"). The Court concludes that an injunction ordering authorization of the Stephens Silo site is a proper remedy for the Board's violation of § 332(c)(7)(B)(iv). *See Oyster Bay*, 166 F.3d at 497 ("an injunction ordering the Town to issue the permits was an appropriate remedy" where "remand would serve no useful purpose").

42

## IV. CONCLUSION

The Court grants in part and denies in part each parties' cross-motion for summary judgment. First, T-Mobile fails to make the necessary showing that, in denying the Bell Tower application, the Board effectively prohibited the provision of personal wireless services. Finding no genuine issue of material fact as to whether the Board violated 47 U.S.C. § 332(c)(7)(B)(i)(II), the Court grants summary judgment in favor of the Board on Count II of T-Mobile's Third Amended Complaint.

Second, the Court holds that the Board's decisions to deny the Bell Tower and Stephens Silo applications were supported by substantial evidence in the written record before the Board when it made its decisions. Finding no genuine issue of material fact as to whether the Board violated 47 U.S.C. § 332(c)(7)(B)(iii), the Court grants summary judgment in favor of the Board on Counts I and IV.

Third, T-Mobile fails to make the necessary showing that the Board's decision to deny T-Mobile's Bell Tower application was impermissibly based on environmental effects of RF emissions. Finding no genuine issue of material fact as to whether the Board violated 47 U.S.C. § 332(c)(7)(B)(iv) in its decision on the Bell Tower application, the Court grants summary judgment in favor of the Board on Count III.

Fourth, the evidence in the record before the Court demonstrates that the Board's decision to deny the Stephens Silo application was impermissibly based on environmental effects of RF emissions. The Board fails to create a genuine dispute as to whether it violated 47 U.S.C. § 332(c)(7)(B)(iv) in denying this application. Accordingly, the Court grants summary judgment in favor of T-Mobile on Count V of its Third Amended Complaint. The Board's decision on the

Stephens Silo application is void under 47 U.S.C. § 332(c)(7)(B)(iv). The Board is directed to grant the permits necessary to authorize construction of T-Mobile's proposed wireless service facility at the Stephens Farm in Lovettsville, Virginia.

**IT IS SO ORDERED.**

The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this /2^h day of October 2012.

Alexandria, Virginia
10 / /2/ 2012

_____/s/_____
Gerald Bruce Lee
United States District Judge